JUSTIN D. SANTAGATA, ESQ. (NJ ID 00082219/NY ID 484075)
COOPER LEVENSON P.C.
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
C: 609-247-3121
E: jsantagata@cooperlevenson.com
Attorneys for Plaintiff

|  |  |
|---|---|
| MANDELL PRATT,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF NEW YORK, JOSEPH RUBINO, and JOVIAN MINGUEZ,<br><br>    Defendants. | UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK<br><br>DOCKET:<br><br>COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND MALICIOUS PROSECUTION<br><br>JURY TRIAL DEMANDED |

Plaintiff Mandell Pratt alleges as follows pursuant to Fed.R.Civ.P. 8.

## **INTRODUCTION**

1.  In 2023, Plaintiff Mandell Pratt worked with at-risk youth at the New York Department of Education in Bronx, New York. In August 2023, his life was upended when Defendant Jovain Minguez falsely alleged that Mr. Minguez assaulted him during a driving altercation. Mr. Pratt merely acted in self-defense and Mr. Minguez was the aggressor.

2.  On June 24, 2024, a jury agreed and acquitted Mr. Pratt of assault, but there was never probable cause to prosecute Mr. Pratt to begin with and, as the investigation went on and trial approached, the basis for prosecution of Mr. Pratt

became even more unconstitutional. For example, a bodycam(s) video ignored by police shows two witnesses corroborating Mr. Pratt's version of events.

## PARTIES

3. Mr. Pratt is a resident of and domiciled in Bronx, New York.

4. Mr. Minguez is a resident of and domiciled in Queens, New York.

5. Defendant Joseph Rubino is an officer with the New York City Police Department.

6. Defendant City of New York is responsible for supervision and control of the New York City Police Department and the Queens District Attorneys' Office.

## I. Facts leading to malicious prosecution

7. On August 11, 2023, Mr. Pratt left work at the New York Department of Education in the Bronx, where he works with at-risk youth, to visit his grandmother in the Astoria Projects in Queens. He traveled via the Major Deegan Expressway, then over the Robert F. Kennedy Bridge. While Mr. Pratt was merging into traffic on the on-ramp for the Major Deegan Expressway, he merged in front of Mr. Minguez. Mr. Minguez went wild, blowing his horn and pulling next to Mr. Pratt. Mr. Minguez proceeded to follow Mr. Pratt seven miles to near the Hoyt Avenue/31st Street exit. During this time, Minguez continued blowing his horn at Mr. Pratt, riding alongside him, and pulling in front of him and slamming on his brakes.

8. Mr. Minguez stopped near the same exit as Mr. Pratt, but did not actually take the exit. He continued his aggressive/road rage behavior and was pointing at his car/bumper to indicate (or feign) they had been involved in an accident

and pulled his trunk open. At this point, Mr. Pratt pulled over and walked over to Mr. Minguez's vehicle, thinking that some sort of accident had occurred. Instead, Mr. Minguez screamed "I'm going to kill you, you dumb nigger" and threw a punch at Mr. Pratt. Mr. Pratt evaded it and Mr. Minguez fell over. Mr. Pratt turned to walk back to his car, but Mr. Minguez got up and grabbed Mr. Pratt from behind. Mr. Pratt turned and threw Mr. Minguez off him and walked to his car. Mr. Pratt then continued to his grandmother's apartment nearby.

9. Police arrived at the scene after Mr. Pratt left. Police interviewed several individuals at the scene, but either did not take their names or contact information or did not follow up. One individual said he had a video of the incident and was ignored. While interviewing individuals in the foreground, one police officer's bodycam captures two Spanish men describing and mimicking what occurred, exactly as Mr. Pratt would ultimately describe it at trial. This was ignored by the prosecution.

10. Mr. Pratt freely submitted himself to an interview with investigating officer Mr. Rubino, on two separate occasions, once with his father, Mandell Pratt, Sr. present, and the second with his attorney present. Both times, he told Mr. Rubino that he acted in self-defense. Mr. Pratt's attorney told Mr. Rubino to obtain the video footage from the cameras from the Major Deegan Expressway, Robert F. Kennedy Bridge, and the 31st Street / Astoria Blvd exit and they would corroborate Mr. Pratt's version of events and to review the bodycams(s). Mr. Rubino did not do anything.

11. At the time of the altercation, Mr. Rubino had a history of allegations against him for failure to investigate or to follow up with witnesses, some of which

were "substantiated." For example, on July 27, 2021, the New York City Police Department found that Mr. Rubino had failed to investigate and complete a report on a stop and frisk investigation.

12. The New York City Police Department's "Patrol Guide,"[1] while thousands of pages long, does not generally require officers to secure videos where witnesses state that such videos exist. Such direction is inexplicably limited to "offenses involving firearms."

13. On August 22, 2023, Mr. Pratt was charged with assault via complaint by Mr. Minguez and sworn by Mr. Rubino, who had an obligation to determine probable cause. Mr. Pratt was arrested and detained for nearly 24 hours. He was released on his own recognizance. The "Patrol Guide" does not define "probable cause" to require "reasonably trustworthy information" and Mr. Rubino's sworn complaint relies on nothing other than Mr. Minguez.

14. The Queens District Attorney's Office has a policy of providing trial experience to inexperienced prosecutors on low-level alleged "crimes" like Mr. Pratt's situation. This policy creates a bent toward prosecution even where, as here, there was no probable cause.

15. On December 1, 2023, Mr. Pratt was indicted by a grand jury based only on the testimony of Minguez, Theresa Addeo, and police officer Sean Yeaman (who testified as to a photo array only).

---

[1] The New York City Police Department is an agency and arm of the City of New York.

4

16. Addeo told the grand jury that she was sitting in the back of a car and saw Mr. Pratt and Minguez pushing each other; she did not testify about who was the aggressor or how the altercation started. She testified the same at a Pratt-Wade[2] hearing. However, at trial, she changed her testimony and described Mr. Pratt as the aggressor.

17. Minguez testified to the grand jury that he stopped near the Hoyt Avenue/31st Street exit only after he saw Mr. Pratt pull off to that exit. At trial, Minguez changed his story and testified that he stopped first and then Mr. Pratt stopped.

18. The grand jury was not shown the bodycam(s), despite that the "Patrol Guide" clearly required Mr. Rubino to be able to translate the discussion of the two Spanish men or alert an officer who could.

19. Mr. Pratt was acquitted on June 24, 2024, after only three hours of deliberations, with jurors mimicking what they saw in the bodycam(s).

## II. Facts as to lack of probable cause to charge and continue prosecution

20. Probable cause must exist at the time of arrest and must continue through all subsequent proceedings.

21. Probable cause requires reasonably trustworthy information.

22. Here, probable cause required reasonably trustworthy information that Mr. Pratt assaulted Mr. Minguez *and did not act in self-defense*; the prosecution bore *both burdens*.

---

[2] A Pratt-Wade hearing is to determine the validity of photo array.

23. At the time of the assault charge against Mr. Pratt, there was no reasonably trustworthy information justifying probable cause. The only video evidence, the bodycam(s), show bystanders mimicking Mr. Pratt's version of events and discussing the altercation in a way that defeated any probable cause.

24. Mr. Rubino ignored multiple witnesses to the altercation and failed to follow even common sense protocol to obtain all video evidence of the altercation.

25. In a bodycam video, Addeo says "I have no idea" when asked "tell me exactly what the other guy did to him [Mr. Minguez]."

26. In another bodycam video, the two Spanish men who mimicked what happened tell an officer there was "no fighting." The two Spanish men first tried to converse with the officer in Spanish, but the officer does not understand. When the officer suggests that Mr. Pratt (his name then-unknown) was the aggressor, one of the Spanish men says in Spanish "no, he wanted to like stop him, he did not want to fight." Then, apparently referring to Mr. Minguez, the same man says in Spanish: "he opened his trunk like three times, he was scared, nervous, he opened the trunk I believe so no one would take pictures," showing Mr. Minguez was the aggressor and confronted Mr. Pratt. There was no testimony at any point by anyone that Mr. Pratt ever opened his trunk.

27. In another bodycam video, another witness tells the officer he has a video of the altercation but has to leave and gives the officer his information. Mr. Rubino (and everyone else) failed to follow up with this witness for unknown reasons.

28. Given the above, it is more likely than not that Mr. Minguez and Addeo changed their testimony in preparation for trial to make Mr. Pratt sound like the aggressor and that change occurred in preparation with the prosecutor.

### III. Facts as to municipal liability for the City of New York

29. As set forth above, the "Patrol Guide" fails to provide common sense direction to officers to preserve all relevant videos. This is a failure to train. The "Patrol Guide" actually goes further and specifically states that relevant videos should be preserved only for "offenses related to firearms." The "Patrol Guide" further fails to properly define probable cause to include "reasonably trustworthy information."

30. As set forth above, at the time of his investigation of the altercation, Mr. Rubino had a disciplinary history including several allegations of failure to investigate, at least one of which was "substantiated." There is no evidence Mr. Rubino was re-trained after these allegations.

31. As set forth above, Mr. Pratt's prosecution was part of a policy for training inexperienced prosecutors with the Queens County District Attorney's Office.

32. The above policies and practices individually and collectively caused the malicious prosecution of Mr. Pratt.

### IV. Mr. Pratt's damages

33. Because of the malicious prosecution here, Mr. Pratt lost his job at the New York Department of Education. His salary was $86,000 per year, with full

7

health, dental, and vision benefits, and a matching "401(k)" plan or its equivalent. Mr. Pratt was physically detained for nearly 24 hours and seized for trial for over a year. He suffered significant and documentable psychiatric harm. While Mr. Pratt is now re-employed, he makes less money and does not have equivalent benefits.

## COUNT ONE: COMMON LAW MALICIOUS PROSECUTION AGAINST ALL DEFENDANTS

34. Mr. Pratt repeats and re-alleges the above as it fully set forth in this count.

35. On September 10, 2024, Mr. Pratt served a notice of claim of common law malicious prosecution on the New York City Comptroller pursuant to NY Gen. Muni Law. § 50-e.

36. On March 4, 2025, Mr. Pratt testified in a hearing under NY Gen. Muni Law § 50-h.

37. Mr. Pratt has satisfied the prerequisites to file a common law malicious prosecution claim against Mr. Rubino and the City of New York.

38. Any person who made, influenced, or participated in the decision to prosecute is liable for malicious prosecution, which includes not just Mr. Rubino but Mr. Minguez.

39. In investigating the altercation, Mr. Rubino violated multiple rules in the "Patrol Guide," notwithstanding the lack of training or direction on the subjects above. These violations include: failure to follow-up on relevant witnesses, failure to review bodycam(s), and failure to follow the protocol for non-English speaking witnesses.

40. Here, Mr. Pratt was prosecuted without probable cause, the prosecution was terminated in his favor, Defendants acted with malice, and he has been damaged.

### COUNT TWO: CONSTITUTIONAL MALICIOUS PROSECUTION
### AGAINST MR. RUBINO
### (NEW YORK/UNITED STATES CONSTITUTION; 42 U.S.C. § 1983)

41. Mr. Pratt repeats and re-alleges the above as if fully set forth in this count.

42. The New York Constitution Article I, Section 12 and the Fourth and Fourteenth Amendments to the United States Constitution prohibit malicious prosecution.

43. Here, Mr. Pratt was subjected to malicious prosecution under both the New York Constitution and the United States Constitution because: (i) he was prosecuted without probable cause; (ii) the prosecution resulted in seizure; (iii) the prosecution was terminated in his favor; (iv) Mr. Rubino acted with malice,[3] which is generally established when there is an absence of probable cause; and (v) he has been damaged.

44. At all times relevant, Mr. Rubino acted under color of state law (as did the prosecutor).

### COUNT THREE: MUNICIPAL LIABILITY
### AGAINST THE CITY OF NEW YORK
### (42 U.S.C. § 1983; NEW YORK CONSTITUTION)

45. Mr. Pratt repeats and re-alleges the above as if fully set forth in this count.

---

[3] Malice for malicious prosecution is not synonymous with intent to cause harm or to act badly, but can be established through gross negligence, disregard of procedures, etc.

9

46. The City of New York is liable for malicious prosecution because its policies and practices individually and collectively caused the malicious prosecution of Mr. Pratt, as set forth above.

## DEMAND FOR RELIEF

Pursuant to the counts above, Plaintiff demands relief as follows:

(i) Compensatory damages

(ii) Emotional distress and reputational damages

(iii) Nominal damages

(iv) Punitive damages

(v) Attorneys' fees and costs pursuant to 42 U.S.C. § 1988

(vi) Such other relief as the court deems equitable and just.

## DESIGNATION OF TRIAL COUNSEL

Justin D. Santagata, Esq. is hereby designated as trial counsel for Plaintiff.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable.

## RELATED CASES CERTIFICATION

I certify that the matter in controversy is not the subject of any other action pending or contemplated. I further certify that I am aware of no other parties who should be joined in this matter.

Dated: May 31, 2025

_____
JUSTIN D. SANTAGATA, ESQ.